UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 18-cr-10206-NMG |
| | ) | |
| ALEXANDER GRINIS | ) | |

MEMORANDUM IN SUPPORT OF
DEFENDANT'S EXPEDITED MOTION FOR MODIFICATION OF SENTENCE
AND COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

Defendant Alexander Grinis ("Mr. Grinis") respectfully moves this Honorable Court for modification of his sentence and compassionate release pursuant to recently amended 18 U.S.C. § 3582(c)(1)(A) based on the "extraordinary and compelling reasons" discussed below. Mr. Grinis' projected release date is June 16, 2020, and he has served approximately 80% of his 9 month sentence. He suffers from a documented history of hypertension, atypical chest pain, depression, and anxiety. In light of the COVID-19 pandemic, the Court should grant immediate compassionate release not only to protect Mr. Grinis but to promote the health and safety of other at the institution, staff, and community.

**Statement of Facts**

Mr. Grinis has served over 7 months of his 9-month sentence on the charge of false statement on a loan application, 18 U.S.C. § 1014. ECF. No. 108 ("Judgment"). Prior to the instant offense, Mr. Grinis had no criminal history whatsoever. PSR ¶¶55-61. Mr. Grinis accepted responsibility for his role in the instant case and, at sentencing, the Court varied below the guideline range based on his employment record, family ties and responsibilities, status as a non-violent offender, and his demonstration of remorse. ECF. No. 109 at 4 ("Statement of Reasons"). In its Statement of Reasons, the Court further wrote it "imposes a 9-month prison sentence (40% below the low end of the applicable guideline range) because defendant was much less culpable

1

than his co-defendant in the criminal scheme and has shown genuine remorse since he pled guilty." *Id*. at 4.

Mr. Grinis self-surrendered to FMC-Devens ("Devens") on or about September 18, 2019. ECF. No. 108 at 2. His current projected release date is June 16, 2020. Upon release, Mr. Grinis will be on supervised release for 2 years and subject to mandatory, standard, and special conditions of supervision. *Id*. at 3-5.

1. **The COVID-19 Crisis**

The novel coronavirus that causes COVID-19 has led to a global pandemic. As of April 27, 2020 there were more than 2,981,592 confirmed COVID-19 cases throughout the world and more than 965,933 confirmed cases in the United States.[1] The COVID-19 death toll has risen to 206,803 worldwide[2] and to over 50,000 in the United States alone.[3] In Massachusetts, as of April 25th the total number of confirmed cases was 54,938 and total number of deaths had increased to 2,899.[4] Projections range from 100,000 to 200,000 deaths in the United States in the best case scenario, to as many as 1.5 million deaths in the most severe scenario.[5]

---

[1] *Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard,* https://coronavirus.jhu.edu/map.html (last accessed Apr. 27, 2020)
[2] *Id.*
[3] *U.S. Coronavirus Death Toll Passes 50,000*, NPR (April 24, 2020) https://www.npr.org/sections/coronavirus-live-updates/2020/04/24/844039508/u-s-coronavirus-death-toll-passes-50-000 (last accessed Apr. 27, 2020)
[4] *The Latest Coronavirus Numbers from Massachusetts*, The Boston Globe, https://www.bostonglobe.com/2020/03/10/nation/latest-coronavirus-numbers-massachusetts/ (last accessed Apr. 25, 2020)
[5] *Dr. Deborah Birx Predicts Up to 200,000 Death "If We Do things Almost Perfectly,"* NBC News (Mar. 30, 2020) https://www.nbcnews.com/news/us-news/dr-deborah-birx-predicts-200-000-deaths-if-we-do-n1171876; Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, New York Times (Mar. 13, 2020) https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html (last accessed April 24, 2020)

On March 11, 2020 the World Health Organization officially classified COVID-19 as a global pandemic.[6] President Trump declared a national emergency to address the pandemic.[7] Governor Baker also declared a state of emergency in Massachusetts, and has issued at least 45 emergency orders.[8] Those orders include closing all non-essential businesses, closing all elementary and secondary schools, prohibiting on-site consumption of food and beverages, restricting visitor access to nursing homes, and prohibiting public gatherings of 10 or more people throughout the Commonwealth.[9] The Massachusetts Supreme Judicial Court has closed all Massachusetts courthouses to the public except to conduct emergency hearings that cannot be conducted by teleconference.[10] For its part, this Court has issued fifteen General Orders relative to COVID-19, including continuing all jury trials and grand jury proceedings until May 29, 2020 (General Orders 20-13, 20-14). At the time of this drafting, at least 316 million people in at least 42 states, three counties, and 10 cities are being urged or ordered to "stay home."[11]

The federal, state, and local governments have virtually all required or recommended measures that deter congregations of people and encourage "social distancing" to slow the spread of the highly contagious virus. The Centers for Disease Control and Prevention ("CDC") advise that the virus passes between people who are within six feet of one another through respiratory

---

[6] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS (last accessed Apr. 24, 2020).
[7] Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Conference (March 13, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-conference-3/.
[8] *COVID-19 State of Emergency*, https://www.mass.gov/info-details/covid-19-state-of-emergency (last accessed Apr. 24, 2020).
[9] *Id.*
[10] Supreme Judicial Court Order regarding court operations under the exigent circumstances created by the COVID-19 (coronavirus) pandemic (April 1, 2020), https://www.mass.gov/supreme-judicial-court-rules/supreme-judicial-court-order-regarding-court-operations-under-the (last accessed Apr. 24, 2020).
[11] Sarah Mervosh, Denise Lu & Vanessa Swales, *See Which States and Cities Have Told Residents to Stay at Home*, The New York Times (Apr. 3, 2020), available at https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html (last accessed Apr. 27, 2020).

droplets and by contact with surfaces.[12] COVID-19 may remain on surfaces for up to three days.[13] As many as 25 percent of people infected with COVID-19 may not show symptoms, leading them to unwittingly spread the disease to others.[14] Social distancing, proper hygiene, frequent cleaning of all surfaces, and frequent and thorough hand washing are all crucial to combatting transmission. On April 3, 2020, the CDC even recommended that all people in the United States wear masks when leaving their homes.[15] The COVID-19 crisis is unprecedented in modern times and extraordinary measures are necessary to protect the nation's citizens.

### 2. COVID-19 Presents An Increased Threat to Vulnerable Inmates at FMC-Devens

FMC-Devens hosts a Federal Bureau of Prisons ("BOP") medical center and satellite camp that hold over 1,000 men, including some of America's most elderly, sick, and medically vulnerable prisoners. Those prisoners are acutely at risk of illness and death due to the COVID-19 pandemic, and any outbreak at the prison will imperil not only them, but also BOP staff and the surrounding community.

Realizing that we are in the midst of a crisis unlike any that we have experienced in generations, on March 26, 2020, Attorney General William Barr sent a memorandum to the Director of the BOP "directing [him] to prioritize the use of [his] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the COVID-19

---

[12] *How to Protect Yourself & Others*, Center for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed April 24, 2020)
[13] Neeljte van Doremalen, et. al., *Aerosol and Surface Stability of SARS-CoV2 as Compared with SARS-COV-1*, New England Journal of Medicine (Mar. 17, 2020). ("SARS-CoV- 2 was more stable on plastic and stainless steel than on copper and cardboard, and viable virus was detected up to 72 hours after application to these surfaces"), available at https://www.nejm.org/doi/10.1056/NEJMc2004973.
[14] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, The New York Times (Mar. 31, 2020), available at https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatictransmission.html.
[15] Centers for Disease Control and Prevention, *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission* (Apr. 3, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

4

pandemic."[16] The Attorney General specifically recognized that "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than BOP facilities."[17] On April 3, 2020, the Attorney General issued another memorandum that provided even further directives and guidance to BOP.[18] Members of Congress have also called on the Department of Justice to "do all [it] can to release as many people as possible who are currently behind bars and at risk of getting sick."[19]

Available statistics reveal a public health disaster now erupting across BOP facilities that worsens with each passing day. As of April 27, 2020, the BOP reports that 799 federal inmates and 319 BOP staff have confirmed positive test results for COVID-19 nationwide.[20] At least 27 federal inmates have been killed by COVID-19.[21] From March 20 to April 25, confirmed COVID-19 cases among BOP prisoners and staff rose from 2 to 1047 infections across 45 facilities nationwide.[22]

---

[16] William Barr, Memorandum for Director of Bureau Prisons (Mar. 26, 2020), available at: Memo from Attorney General to Director of Bureau of Prisons, March 26, 2020, https://www.justice.gov/file/1262731/download, attached at *Ex. A*.
[17] *Id.*
[18] See William Barr, Memorandum for Director of Bureau Prisons (Apr. 3, 2020), available at https://www.justice.gov/file/1266661/download, attached at *Ex. B*.
[19] *See* March 19, 2020 Letter from U.S. Reps. Jerrold Nadler & Karen Bass to Attorney General William P. Barr, available at Available at https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf ("With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action."); *see also* Letter from Senator Kathleen Harris to BOP Director Michael Carvajal (Mar. 19, 2020), available at https://www.harris.senate.gov/imo/media/doc/Harris%20Letter%20to%20Carvajal%20(3.19).pdf (urging BOP to "tak[e] reasonable steps to reduce the incarcerated population and guard against potential exposure to coronavirus").
[20] https://www.bop.gov/coronavirus/ (last accessed Apr. 27, 2020).
[21] *Id.*
[22] *Id.*; Graph available https://federaldefendersny.org/ (last accessed Apr. 27, 2020).



Federal prisoners are at far greater risk for contracting COVID-19 than other members of the community. Since it confirmed its respective first cases, the growth rate of infections at BOP dwarfs the relative growth rate of the nation as a whole.[23]



---

[23] *Id.*; Tables and graphs available https://federaldefendersny.org/ (last accessed Apr. 27, 2020)

| Day of Known COVID-19 Case | BOP Date | BOP Infections | U.S. Date | U.S. Infections |
|---|---|---|---|---|
| Day 1 | 3/20/2020 | 2 | 1/22/2020 | 1 |
| Day 2 | 3/21/2020 | 3 | 1/23/2020 | 1 |
| Day 4 | 3/23/2020 | 6 | 1/25/2020 | 2 |
| Day 5 | 3/24/2020 | 9 | 1/26/2020 | 5 |
| Day 7 | 3/26/2020 | 18 | 1/28/2020 | 5 |
| Day 8 | 3/27/2020 | 27 | 1/29/2020 | 5 |
| Day 10 | 3/29/2020 | 38 | 1/31/2020 | 7 |
| Day 11 | 3/30/2020 | 52 | 2/1/2020 | 8 |
| Day 12 | 3/31/2020 | 59 | 2/2/2020 | 8 |
| Day 13 | 4/1/2020 | 94 | 2/3/2020 | 11 |
| Day 14 | 4/2/2020 | 114 | 2/4/2020 | 11 |
| Day 15 | 4/3/2020 | 141 | 2/5/2020 | 11 |
| Day 16 | 4/4/2020 | 174 | 2/6/2020 | 11 |
| Day 17 | 4/5/2020 | 197 | 2/7/2020 | 11 |
| Day 18 | 4/6/2020 | 259 | 2/8/2020 | 11 |
| Day 19 | 4/7/2020 | 313 | 2/9/2020 | 11 |
| Day 20 | 4/8/2020 | 377 | 2/10/2020 | 11 |
| Day 21 | 4/9/2020 | 408 | 2/11/2020 | 12 |
| Day 22 | 4/10/2020 | 481 | 2/12/2020 | 12 |
| Day 23 | 4/11/2020 | 520 | 2/13/2020 | 13 |
| Day 24 | 4/12/2020 | 541 | 2/14/2020 | 13 |
| Day 25 | 4/13/2020 | 589 | 2/15/2020 | 13 |
| Day 26 | 4/14/2020 | 694 | 2/16/2020 | 13 |
| Day 27 | 4/15/2020 | 731 | 2/17/2020 | 13 |
| Day 28 | 4/16/2020 | 752 | 2/18/2020 | 13 |
| Day 29 | 4/17/2020 | 761 | 2/19/2020 | 13 |
| Day 30 | 4/18/2020 | 784 | 2/20/2020 | 13 |
| Day 31 | 4/19/2020 | 804 | 2/21/2020 | 15 |
| Day 32 | 4/20/2020 | 816 | 2/22/2020 | 15 |
| Day 33 | 4/21/2020 | 863 | 2/23/2020 | 15 |
| Day 34 | 4/22/2020 | 908 | 2/24/2020 | 15 |
| Day 35 | 4/23/2020 | 977 | 2/25/2020 | 15 |
| Day 36 | 4/24/2020 | 985 | 2/26/2020 | 15 |
| Day 37 | 4/25/2020 | 1047 | 2/27/2020 | 16 |

Severe outbreaks at FCI Oakdale[24] in Louisiana, FCI Elkton[25] in Ohio, FCI Butner[26] in North Carolina, and FCI Danbury[27] in Connecticut already have resulted in dozens of confirmed

---

[24] *Seventh Inmate Death from COVID-19 reported at FCI-Oakdale I,* KALB (April 15, 2020) https://www.kalb.com/content/news/Seventh-inmate-death-from-COVID-19-reported-at-FCI-Oakdale-I-569679741.html (last accessed Apr. 25, 2020).
[25] *FCI Elkton COVID-19 Among Highest in Prisons,* The Business Journal, (Apr. 22, 2020) https://businessjournaldaily.com/fci-elkton-covid-19-cases-among-highest-in-prisons/ (last accessed Apr. 25, 2020).
[26] *Four Inmates at N.C. Federal Prison Die of Coronavirus Within Three Days*, WECT (Apr. 12, 2020) https://www.wect.com/2020/04/13/four-inmates-nc-federal-prison-die-coronavirus-within-three-days/ (last accessed Apr. 25, 2020).
[27] *With 20 Testing Positive for Coronavirus, Danbury Federal Prison Ordered to Release High-Risk Inmates to Home Confinement*, Hartford Courant (Apr. 4, 2020), https://www.courant.com/coronavirus/hc-news-coronavirus-danbury-prison-inmates-released-20200404-20200404-pn35z5b6wndhvgb5w5tgh7pvf4-story.html (last accessed Apr. 25, 2020).

COVID-19 infections among prisoners and staff, many more suspected but unconfirmed cases, and multiple prisoner deaths.

At Devens, as of April 25, 2020 BOP reports one COVID-19 positive inmate with no staff members having contracted the virus.[28] This is by no means cause for celebration or overconfidence. Far from expeditiously discharging their obligation to maximize transfers out of the facility, the population of Devens has remained essentially static, near capacity in normal times.[29]

| Date | Camp | FMC |
|---|---|---|
| April 9 | 108 | 914 |
| April 16 | 108 | 906 |
| April 23 | 106 | 905 |

Further, FMC-Fort Worth in Texas, a medical prison very similar to Devens, has seen an explosion of confirmed COVID-19 cases in just the past week.[30] On Thursday, April 23rd, BOP confirmed that a shocking 131 inmates and one staff member had tested positive for COVID-19.[31] "The number of positive cases more than doubled from one day earlier and was nearly four times what it was on Tuesday," a local NBC affiliate reported.[32] Devens is at risk of an eruption of positive cases akin to FMC-Fort Worth.

---

[28] https://www.bop.gov/coronavirus/ (last accessed Apr. 25, 2020).
[29] See "Petitioners' Reply to Respondent's Omnibus Response," *Grinis et al v. Spaulding et al*, 20-cv-10738-GAO, ECF No. 38 at *3, citing statistics compiled weekly from https://www.bop.gov/about/statistics/.
[30] *COVID-19 Cases Nearly Quadruple Inside Fort Worth Medical Prison,* NBC DFW, (Apr. 23, 2020) https://www.nbcdfw.com/news/coronavirus/covid-19-cases-quadruple-to-132-at-fort-worth-federal-prison/2356912/ (last accessed Apr. 25, 2020).
[31] *Id.*
[32] *Id.*

8

**Argument**

1. **This Court Should Modify Mr. Grinis' Sentence and Grant him Compassionate Release on Home Confinement until June 16, 2020.**

In the unique circumstances presented by this case, the Court should modify Mr. Grinis' sentence and order him confined to his home until his current projected release date, June 16, 2020.

   a. **Mr. Grinis has exhausted the administrative remedies at BOP and the Court has subject-matter jurisdiction over the instant motion**.

On or about April 17, 2020, Mr. Grinis submitted a formal Compassionate Release / Reduction in Sentence ("RIS") request to Devens. See *Grinis et al v. Spaulding et al*, 20-cv-10738-GAO, ECF No. 32-2, ¶¶5-7 ("Declaration of Amber Bourke, Case Management Coordinator," hereinafter "Bourke Decl."). Devens denied that request on or about April 21, 2020. *Id.* at ¶7. Therefore, Mr. Grinis has exhausted his administrative remedies at BOP and the instant motion is properly before the Court.

As modified by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat 5194, 18 U.S.C. § 3582(c)(1)(A) states, in pertinent part, the following:

> The court may not modify a term of imprisonment once it has been imposed except that — **(1)** in any case — **(A)** the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) [18 USCS § 3553(a)] to the extent that they are applicable, if it finds that — **(i)** extraordinary and compelling reasons warrant such a reduction. . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

In *United States v. MacFarlane*, this Court found that the Warden's denial of defendant's request that BOP file a motion to reduce his sentence constituted exhaustion under the statute. No.

1:19-cr-10131-NMG, Dkt. No. 352 at 2-3 (D. Mass. Apr. 14, 2020) (Gorton, J.) ("Defendant Macfarlane has requested that the BOP file a motion to reduce his sentence and the BOP has denied that request. The Court finds that defendant has therefore fully exhausted his administrative rights and his motion is properly before this Court."). Like in *MacFarlane*, the Court has subject-matter jurisdiction over the instant motion.[33]

### b. "Extraordinary and Compelling Reasons" Warrant a Modification of Mr. Grinis' 9-Month Sentence.

This Court should grant compassionate release to Mr. Grinis, a 49 year-old non-violent first-time offender who has shown sincere remorse for his offense, has already served approximately 80% of his 9-month sentence, suffers from significant health problems, is uniquely vulnerable to COVID-19, and has appropriate locations to quarantine in home confinement.

Mr. Grinis suffers from a documented medical history of hypertension, atypical chest pain, depression, and anxiety. ECF No. 105-3 ("Letter of Dr. Gregory Talalayevsky, M.D."); ECF No. 105-4 ("Letter of Pavel Jalynytchev, M.D."); see also PSR ¶¶74-5. Dr. Talalayevsky of New England Baptist Hospital has treated Mr. Grinis since March 2017, and on July 29, 2019 he wrote the following about Mr. Grinis:

> In the last several months, Alexander has seen significant issues including dramatic weight loss, cardiac conditions, anxiety, and depression. His condition is very concerning.
>
> In particular he has had a syncopal episode on May 9, 2019 treated at Beth Israel Hospital ER, developed chest pain, anxiety/depression. He was referred to cardiology and psychiatry.

---

[33] Further, while unnecessary to find in the instant case, a number of Courts, including the District of Massachusetts, have ruled that the exhaustion requirement may be waived or excused in the emergency circumstances surrounding the COVID-19 pandemic. See e.g. *United States v. Guzman*, 1:18-cr-10086-IT, Dkt. No. 48 (D. Mass. April 17, 2020); see also *United States v. Razzouk*, 1:11-cr-00430-ARR, Dkt. No. 136 (E.D.NY. April 19, 2020); *United States v. Minor*, 19-cr-80152-DMM, Dkt. No. 35 (S.D. Fla. April 17, 2020); *United States v. Colvin*, Dkt. No. 3:19-cr-00179-JBA (D. Conn. April 2, 2020); *United States v. Wilson Perez*, 17-cr-00513-AT, Dkt. No. 98, (S.D.N.Y. April 1, 2020).

10

> My current overall impressions of Alexander are that he is suffering from hypertension, atypical chest pain, and anxiety/depression.
>
> Alex has been referred to cardiac specialist Dr. Jeffrey Popma and psychiatry (sic) Dr. Pavel Jalynytchev.
>
> Moving forward, I expect Alexander will require the following treatment[:] Norvasc 5 mg daily, Crestor 10 mg daily, aspirin 81 mg daily, nitroglycerin 1/150 sublingually as needed for chest pain.
>
> I am aware of Alexander's ongoing legal matters, and I know that he is under considerable anxiety about his future. While I fully understand that the Court will sentence Alex as it sees appropriate, I respectfully suggest that a sentence where he is able to continue treatment with his current team would be of greatest benefit to his health.

ECF No. 105-3.

On July 24, 2019, Pavel Jalynytchev, M.D., a psychiatrist at St. Elizabeth's Hospital, wrote about Mr. Grinis:

> Please be advised that Mr. Grinis is suffering from adjustment disorder with mixed depression and anxiety. He came for intake with me on June 3 of this year with chief complaints of depressed mood, anhedonia, crying spells, insomnia, poor appetite and weight loss as well as daily anxiety which at times he described as disabling and overwhelming.

ECF No. 105-4. The Presentence Investigation Report ("PSR") confirmed Mr. Grinis' "depression and anxiety since his arrest . . . His symptoms include sleeplessness, dizziness, weight loss, and headaches." PSR ¶74. The PSR also verified that Dr. Talalayevsky prescribed Sertraline (50 mg) and Dr. Jalynytchev prescribed Lorazepam (0.5 mg). *Id.*

Mr. Grinis' health condition is so concerning that the Medical Department at Devens recently **"found that Mr. Grinis fit the criterial for being at high risk for COVID-19."** Bourke Decl. ¶23 (emphasis added).

Devens also recently considered Mr. Grinis for extended home confinement consideration. Bourke Decl. ¶23. Mr. Grinis "cleared the review by Unit Team and SIS [Special Investigative Services Department]." *Id*. Accordingly, the Regional Residential Reentry Manager ("RRM") advanced his home confinement release date from May 21 to May 5, 2020. *Id*. Mr. Grinis' receipt of an advanced home confinement date was indicative of his particular fitness for release. As of April 22nd, "118 inmates [had] been reviewed under the expanded criteria for home confinement placement and 91 [had] been denied home confinement as not meeting all of the stated criteria." Bourke Decl. ¶22.

In the cruelest of ironies, however, Mr. Grinis is now in far worse a position that he was before Devens advanced his home confinement release date. As a condition of home confinement, Devens demands that inmates "quarantine for fourteen days prior to transfer," no matter the opportunities to quarantine during home confinement. Bourke Decl. ¶22. With Mr. Grinis' home confinement now advanced to May 5th, his 14-day quarantine at the prison was also advanced. Anxiety-fueled confusion quickly ensued, with disastrous consequences. In her Declaration signed April 22, 2020, Amber Bourke, Case Management Coordinator at Devens, wrote in a footnote:

> It has just been relayed to me that Grinis is refusing to enter the required quarantine before his pending release to home confinement. This refusal to accept assignment into quarantine will result in a disciplinary action and the loss of his pending pre-release placement. Therefore, his placement into any home confinement date is currently subject to rescission upon the processing of a disciplinary action.

Bourke Decl. ¶23 n. 1. Further, according to Shawn Noel, a case manager at Devens' satellite camp, Mr. Grinis is now in the Special Housing Unit ("SHU") for the alleged infraction and may indeed lose home confinement through BOP altogether.[34]

---

[34] See Declaration of David J. Grimaldi ("Grimaldi Decl."), attached at *Ex. C*, at ¶4. Mr. Noel also stated that Mr. Grinis was found in possession of an "ointment" containing Russian lettering. According to Mr. Noel, hearings on

12

This is a wholly paradoxical turn of events. Mr. Grinis allegedly "refused" to be placed in quarantine, only to then be disciplined in a manner worse than the quarantine itself. Rather being born of ill intent, Mr. Grinis' so-called "refusal" to quarantine is the clear product of confusion about the posture of his legal case and his severe anxiety about spending 14 days in quarantine. According to Shawn Noel, at the time of his so-called "refusal" Mr. Grinis cited a motion pending before the judge. See Grimaldi Decl. ¶4. Indeed, on April 8, 2020, Mr. Grinis prepared a *pro se* "Emergency Motion Requesting That the Bureau of Prisons Allows Mr. Grinis to Self Quarantine at Home," and the Court docketed that motion on April 14, 2020. ECF No. 151 ("*pro se* motion"). The *pro se* motion correctly noted that Mr. Grinis was "expected to be released" from Devens "sometime around May of 2020," but that per prison policy "prior to his release he must be quarantined for 14 days." *Id*. at 1. Mr. Grinis understood that the two-week quarantine would occur "in a disciplinary cell" which is "generally used to punish inmates who violate prison rules." *Id*. Mr. Grinis stated that "at present those cells are being used to house inmates who have shown some symptoms of contracting the COVID-19 virus," therefore making him "more likely to contract the virus." *Id*. at 1-2. Concerned, Mr. Grinis noted the Court's familiarity with his "underlying health conditions," including "hypertension, atypical chest pain and anxiety/depression," and the risk COVID-19 posed in light of his documented health problems. *Id.* at 2.

More than this, it is appropriate to consider the "disabling" and "overwhelming" nature of Mr. Grinis' "daily anxiety," which Dr. Pavel Jalynytchev has discussed in terms of an "adjustment disorder." See ECF No. 105-4. While a formal excuse for Mr. Grinis' so-called "refusal" to

---

the so-called "refusal" to quarantine and the alleged possession of the ointment were scheduled for April 29 and April 30, 2020, respectively.

quarantine for 14-days may not be obvious, it does not follow that Mr. Grinis "refusal" was born of bad intentions. Devens' Medical Department had already "found that Mr. Grinis fit the criterial for being at high risk for COVID-19;" the prison's demand that he immediately quarantine was sudden in light of his recent grant of advanced home confinement, and a clinically ill and anxious Mr. Grinis already had a request for home quarantine pending with the Court. This recent turn of events should not interfere with Mr. Grinis' instant request for modification of sentence and request for home confinement until June 16, 2020. In fact, he now suffers greater risk of contracting COVID-19 than at any time prior.

### c. Mr. Grinis Should Be Permitted to Quarantine at Home Rather than Devens.

Devens' requirement that Mr. Grinis must quarantine for 14-days before being released to home confinement was and remains unnecessary and counterproductive in the instant circumstances. Upon release, Mr. Grinis has two homes available for quarantine, his longstanding Jamaica Plain residence with his fiancé Diane Taksir ("Ms. Taksir") and a separate one-bedroom Brookline residence maintained by Ms. Taksir.[35] While both Mr. Grinis and Ms. Taksir strongly prefer to live together in Jamaica Plain, the Brookline apartment remains available in the event the Court orders that Mr. Grinis must quarantine completely alone. *Id.*

Attorney General Barr's memo on April 3, 2020 made clear that home confinement is actually *preferable* to continued detention at institutions like Devens.[36] Attorney General Barr wrote:

> For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or in appropriate cases

---
[35] See Affidavit of Diana Taksir ("Taksir Aff.") attached at *Ex. D,* at ¶¶2, 13-14.
[36] See *Ex. B.*

14

> subject to your case-by-case discretion in the residence to which the
> inmate is being transferred . . . understanding . . . that inmates with
> a suitable confinement plan will generally be appropriate candidates
> for home confinement rather than continued detention at institutions
> in which COVID-19 is materially affecting their operations.

*Id.* Already profoundly troubling, Devens' decision to punish Mr. Grinis when he was seeking the precise relief the Attorney General ordered the prison to grant is breathtaking.

In *United States v. Separta*, Judge Nathan in the Southern District of New York confronted and dispensed with a similar BOP order for 14-day quarantine at FCI-Butner. See *Opinion and Order* (Nathan, J.), 1:17-cr-10328-WGY, Dkt. 117-1 (S.D.N.Y April 22, 2020). Judge Nathan noted that the conditions and circumstances of FCI-Butner's "quarantine," contrary to the government's claims, would "inevitably permit the virus to spread." *Id*. at 1. Calling the BOP's order "Kafkaesque," *id.* at 2, Judge Nathan wrote, "[t]he Court speaks in stark terms: this is an illogical and self-defeating policy that appears to be inconsistent with the directive of the Attorney General, ungrounded in science, and a danger to both [the defendant] and the public health of the community." *Id.* at 6. In its Conclusion, the Court was firm:

> The Government is ORDERED to release [defendant] from custody
> immediately. To be clear, the Court will not abide delaying
> [defendant's] release for any period of time in the name of a so-
> called quarantine that only furthers the danger to [defendant] as well
> as the public health of the community at large. Instead, to protect
> [defendant], his family, and the public, the Court will require Mr.
> [defendant] to instead self-isolate for 14 days in his home.

*Id.* at 20.

Science and reason fully support the same conclusion here. In a recent sworn Declaration, Professor Seth Prins ("Prof. Prins") of Columbia University's Mailman School of Public Health made clear the unscientific and counterproductive nature of Devens' 14-day quarantine

requirement.[37] Prof. Prins noted, "FMC-Devens is currently requiring apparently healthy individuals who are not exhibiting any COVID-19 symptoms to 'quarantine' for two weeks in solitary confinement in the Special Housing Unit ("SHU") or some similar setting before they can be released." *Id.* ¶5. Prof. Prins criticized Devens' measure as not only ineffective against the virus, but inhumane. He wrote:

> I am unaware of any studies supporting solitary confinement as a disease containment strategy in jails or prisons, and based on my experience and professional knowledge, it would not effectively constrain the spread COVID-19 in a carceral setting. Unless the entire SHU was a negative pressure environment, the air-borne droplets of COVID-19 virus would be spread by air-circulation throughout the unit. The circulation of medical staff and correctional officers into and out of the unit would also transmit the virus to other parts of the facility and into the surrounding community.
>
> In my professional opinion, even in the midst of the current pandemic, it is ineffective as a public health measure to hold prisoners in such inhumane conditions for two weeks before releasing them from a facility.
>
> . . .
>
> Isolation in solitary confinement is not only ineffective as a health measure, it is also inhumane.
>
> Because of my professional focus on mental health in the carceral system, I am very familiar with the body of work reviewing the use of solitary confinement in jails and prisons. The literature makes clear that solitary confinement is extraordinarily punitive and can have a severe impact on prisoners in even a short period of time.
>
> . . .
>
> Based on its severe psychological and physiological impacts, solitary confinement is frequently described as akin to torture.
>
> These severe impacts are true regardless of whether the individual is housed in the SHU or a different unit that similarly holds them in solitary confinement. Regardless of the name, forcing an individual to experience such extreme isolation cannot be made less punitive.

---

[37] See Declaration of Professor Seth Prins, attached at *Ex. E*.

*Id*. ¶¶ 5-6, 10-11, 13-14.

This Court should order Mr. Grinis — a man suffering from hypertension, cardiac problems, anxiety/depression, and already found vulnerable to COVID-19 — to home confinement rather than quarantined at Devens.

### d. Federal Courts are Correct to Modify the Sentences of Non-Violent Prisoners With Limited Criminal Records Who Accepted Responsibility for Their Offense, Have Served Most of Their Sentence, and Are Particularly Vulnerable to COVID-19.

Because prisons are such an unfortunate breeding ground for COVID-19, Federal Courts are correct to modify the sentences of inmates like Mr. Grinis who are non-violent, have limited criminal records, accepted responsibility for their offense, have served most of their sentence already, and are particularly vulnerable to COVID-19, so that they can shelter from the virus in a far safer environment like home confinement.

In the District of Massachusetts, the Court has granted or partially granted requests for modifications of sentences for multiple inmates since the onset of the COVID-19 pandemic. See e.g. *United States v. Macfarlane*, No. 1:19-cr-10131-NMG, Dkt. No. 352 (D. Mass. Apr. 14, 2020) (Gorton, J.) (holding that the COVID-19 pandemic, the risk it imposes to sentenced inmates, the defendant's status as a non-violent first time offender, and other factors constitute "extraordinary and compelling circumstances which warrant a reduction in [the defendant's] sentence"); *United States v. Capelton*, No. 3:00-cr-30027-MGM, Dkt. No. 539 (D. Mass. April 10, 2020) (granting compassionate release "in light of Defendant's short remaining time before his release, his age, and the conditions at MDC-Brooklyn" and modifying sentence to time served and home confinement with revised conditions of supervised release); *United States v. Sanderson*, No. 1:14-cr-10168-FDS, Dkt. No. 215 (D. Mass. April 6, 2020) (granting compassionate release, with assent of government).

17

Other Districts have issued similar orders granting compassionate release requests made in response to COVID-19. See e.g. *United States v. Razzouk*, 1:11-cr-00430-ARR, Dkt. No. 136 (E.D.NY. April 19, 2020) (granting compassionate release to "first-time offender" convicted of "four non-violent offenses" and documented medical conditions); *United States v. Minor*, 19-cr-80152-DMM, Dkt. No. 35 (S.D. Fla. April 17, 2020) (granting compassionate release to defendant convicted of mail fraud with release date in January 2022 who "is not a danger to the safety of any other person or to the community"); *United States v. Burrill*, 3:17-cr-00491-RS, Dkt. No. 308 (N.D. Cal April 10, 2020) (granting compassionate release to inmate convicted of investment advisor fraud and filing false tax return "in light of the heightened risk the COVID-19 pandemic poses to [the defendant]"); *United States v. Tran*, No. 8:08-cr-00197-DOC, Dkt. No. 405 (C.D. Cal. April 10, 2020) (granting compassionate release for inmate with "lifelong asthma condition"); *United States v. Colvin*, 3:19-cr-00179-JBA, Dkt. No. 38 (D. Conn. April 2, 2020) (modifying sentence for diabetic defendant with eleven days remaining on sentence, over government objection); *United States v. Jepsen*, 3:19-cv-00073-VLB, 2020 WL 1640232 (D. Conn April 1, 2020) (granting compassionate release for "immunocompromised" defendant "having less than eight weeks left to serve on his sentence," with the consent of the government); *United States v. Williams*, 3:04-cr-00095-CJK, Dkt. No. 91 (N.D. Fla. April 1, 2020) (modifying sentence of Career Offender "in light of his serious deterioration in physical health and the increasing health risks that the current global pandemic of coronavirus.").[38]

---

[38] Further, it is worth noting that the District of Massachusetts and other Districts have also released convicted defendants on grounds other than compassionate release, such as release pending sentencing, release pending appeal, and resumption of supervised release. See e.g. *United States v. Lamothe*, No. 1:15-cr-10147-MLW (D. Mass. April 15, 2020) (releasing defendant with no underlying health issues back on supervised release conditions, with government's assent); *United States v. Ivery*, No. 1:02-cr-10402-WGY, Dkt. No. 59 (D. Mass. April 14, 2020) (releasing defendant over government objection pending final hearing on supervised release violation, with caveat that "when the pandemic ends, Defendant is to return to custody"); *United States v. Calhoun*, No. 1:10-cr-10082-DPW, Dkt. No. 151 (D. Mass. March 31, 2020) (granting release pending Supervised Release revocation hearing, with assent from government and probation)l *United States v. Leon*, No. 1:19-cr-00051, Dkt. No. 28 (D.R.I. April 20, 2020)

Mr. Grinis is well-within the categories of defendants that District Courts have recently found appropriate for modified sentences and compassionate release in light of the COVID-19 pandemic. Mr. Grinis respectfully asks the Court to grant the relief requested.

**Conclusion**

For the aforementioned reasons, this Court should ALLOW Mr. Grinis' request for a modification of sentence and order him released immediately to home confinement until June 16, 2016.

DATE: April 27, 2020

Respectfully Submitted,
ALEXANDER GRINIS
By his attorney:

*/s/ David J. Grimaldi*
David J. Grimaldi
David J. Grimaldi, P.C.
BBO No. 669343
929 Massachusetts Avenue, Suite 200
Cambridge, MA 02139
617-661-1529 (tel)
857-362-7889 (fax)
david@attorneygrimaldi.com

CERTIFICATE OF SERVICE

I, David J. Grimaldi, hereby certify that true copies of this notice were served on all registered participants via CM/ECF this 27th day of April, 2020

*/s/ David J. Grimaldi*
David J. Grimaldi

---

(releasing defendant with asthma pending sentencing on mandatory minimum drug charge, over government objection); *United States v. Monroe*, No. 1:20-cr-00011-JJM-LDA-1, Dkt. No. 25 (D.R.I. April 6, 2020) (granting release pending sentencing over government objection); *United States v. French*, No. 1:12-cr-00160-JAW, Dkt. No. 869 (D. Me. March 31, 2020) (granting motion for bail pending appeal over government's objection).

LOCAL RULE 7.1(a)(2) CERTIFICATION

      I, David J. Grimaldi, hereby certify that pursuant to Local Rule 7.1(a)(2), counsel for Defendant Alexander Grinis conferred with counsel for the United States regarding the issues presented by this motion.

                                          */s/ David J. Grimaldi*
                                          David J. Grimaldi